# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff**, | |
| **v.** | |
| **JASJIT GOTRA**, individually and as an officer or owner of Alliance Security Inc., formerly known as Versatile Marketing Solutions, Inc., VMS Alarms, VMS, Alliance Security, Alliance Home Protection, and AH Protection, | |
| **ALLIANCE SECURITY INC.,** a Delaware corporation, formerly known as Versatile Marketing Solutions, Inc., VMS Alarms, VMS, Alliance Security, Alliance Home Protection, and AH Protection, | CASE NO. 1:18-cv-10548 |
| **JESSICA MERRICK**, a/k/a Jessica Bright, a/k/a Jessica Dudlicek, individually and as an officer of Defend America LLC, | |
| **DEFEND AMERICA LLC**, a Florida Limited Liability Company, | |
| **KEVIN KLINK**, individually and as an officer or owner of Power Marketing Promotions LLC, also d/b/a J Tele Alarms, and | |
| **POWER MARKETING PROMOTIONS LLC**, a North Carolina Limited Liability Company, also d/b/a J Tele Alarms. | |
| **Defendants.** | |

## COMPLAINT FOR CIVIL PENALTIES, PERMANENT INJUNCTION, AND OTHER RELIEF

1.      Plaintiff, the Federal Trade Commission ("FTC"), brings this action under Sections 5(a), 5(m)(1)(A), 13(b), and 16(a) of the FTC Act, 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a); Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act (the "Telemarketing Act"), 15 U.S.C. § 6105; and section 621(a) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681s(a), to obtain monetary civil penalties, permanent injunctive relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC

Act, 15 U.S.C. § 45(a); the FTC's Telemarketing Sales Rule ("TSR"), as amended, 16 C.F.R.

Part 310; and the FCRA, 15 U.S.C. §1681-1681x.

## INTRODUCTION

2.      Defendants Alliance Security Inc. ("Alliance") and its CEO and founder, Jasjit

Gotra ("Gotra"), are recidivist violators of the TSR. In 2014, the United States of America sued

Alliance and Gotra in this Court for violating the TSR. *See* No. 1:14-cv-10612 (PBS). Alliance

(previously known as Versatile Marketing Systems) and Gotra agreed to a Stipulated Final Order

(the "2014 Order"), which this Court entered on April 24, 2014. They have never complied with

this Court's 2014 Order, a copy of which is attached as Exhibit 1 to the Complaint. In addition,

Alliance routinely performs unauthorized and unlawful credit inquiries on its potential

customers.

3.      After this Court entered the 2014 Order, Alliance initiated, caused the initiation,

or assisted and facilitated the initiation of at least two million violations of the TSR, including

over one million calls to numbers listed on the National Do Not Call Registry ("DNC Registry").

4.      Alliance installs home security systems. Alliance's employees place outbound

telephone calls to consumers to: solicit the sale of those home security systems and associated

home security alarm monitoring services; arrange for the installation of the home security

systems; and provide consumers with their purchase price, a description of the equipment that

will be installed, the length of the alarm monitoring contract, and other material terms of sale.

From April 24, 2014 through at least July 14, 2017, Alliance sold the alarm monitoring contracts

to Monitronics International, Inc. ("Monitronics") under an exclusive agreement with

Monitronics. In some of its outbound telephone calls, Alliance also solicits the sale of additional

home security products and services. Alliance initiates these calls, many of which are to numbers

listed on the DNC Registry.

5.      Alliance also contracts with third-party telemarketers that initiate similar

outbound telephone calls to consumers to solicit the sale of home security systems and associated

home security alarm monitoring services, including calls to numbers on the DNC Registry. Like

the calls placed by Alliance, these calls by third-party telemarketers also: arrange for the installation of the home security systems; provide consumers with their purchase price, a description of the equipment that will be installed, the length of the alarm monitoring contract, and other material terms of sale; and in some instances, include solicitations for additional home security products and services. Alliance causes the initiation of these calls. For example, Alliance retained Defendants Defend America LLC ("Defend America") and Power Marketing Promotions LLC ("Power Marketing") and authorized them to market for Alliance, and Defend America and Power Marketing subsequently placed outbound calls to numbers listed on the DNC Registry.

6.      After April 24, 2014, and while telemarketing for Alliance, both Defend America and Power Marketing have initiated calls to numbers on the DNC Registry. Even after Alliance received complaints and inquiries about unwanted sales calls by Defend America and Power Marketing while telemarketing for Alliance, Alliance continued its contractual relationship with them.

7.      Defend America and Power Marketing harass consumers so relentlessly with repeated, unwanted sales calls for Alliance home security systems that many consumers resort to scheduling installation appointments just to have a face-to-face opportunity to tell them to stop calling. Alliance's installers have told consumers this happens often. Even after learning about this, Alliance continued its contractual relationships with Defend America and Power Marketing.

8.      To further induce some consumers to arrange for the installation of their home security systems, Alliance and some of its telemarketers, including Power Marketing, have made misrepresentations to deceive consumers about their business affiliation or identity. In certain telemarketing calls, Alliance and Power Marketing telemarketers have misrepresented themselves as calling on behalf of ADT, an unrelated home security company, or as a successor company to ADT, rather than Alliance. Even after learning about these deceptive calls, Alliance did not change its practices or terminate its relationship with the responsible telemarketers.

9.      Alliance also routinely performs unauthorized, undisclosed, and unlawful credit checks on its potential customers, in violation of the FCRA. Specifically, Alliance has obtained consumer reports (both credit scores and full consumer credit reports) from consumer reporting agencies without any permissible purpose, in violation of the FCRA.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. §§ 45(m)(1)(A), 53(b), and 56(a). This action arises under 15 U.S.C. § 45(a).

11.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2)-(3), 28 U.S.C. § 1395(a), and 15 U.S.C. § 53(b).

12.     Since April 24, 2014, Alliance has installed home security systems in homes in Massachusetts. Since April 24, 2014, Alliance has also placed outbound telephone calls to telephone numbers with Massachusetts area codes, including calls to numbers listed on the DNC Registry, in violation of this Court's 2014 Order (as well as the TSR).

13.     At all relevant times, Defend America solicited Massachusetts consumers under a contract with Alliance. Since April 24, 2014, Defend America has set appointments for Alliance installers to install home security systems in homes in Massachusetts. Also since April 24, 2014, Defend America has placed outbound telephone calls to telephone numbers with a Massachusetts area code, including calls to numbers listed on the DNC Registry.

14.     Power Marketing solicits Massachusetts consumers under a contract with Alliance. Since April 24, 2014, Power Marketing has set appointments for Alliance installers to install home security systems in homes in Massachusetts. Also since April 24, 2014, Power Marketing has placed outbound telephone calls to telephone numbers with a Massachusetts area code, including calls to numbers listed on the DNC Registry.

## PLAINTIFF

15.     The FTC is an independent agency of the United States government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices. The FTC further enforces the FCRA, 15 U.S.C. §1681 *et seq.*, which imposes duties on consumer reporting agencies and those who furnish information to a consumer reporting agency or use information obtained from a consumer reporting agency.

16.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violation of the FTC Act, the TSR, and the FCRA, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), and 57b. The FTC is also authorized to obtain civil penalties for violations of the TSR, 15 U.S.C. § 45(m)(1)(A), and violations of the FCRA, 15 U.S.C. § 1681s.

## DEFENDANTS

17.     *Alliance* is a Delaware corporation with its principal place of business in Rhode Island. Alliance was formerly incorporated in Massachusetts as Versatile Marketing Solutions, Inc. Alliance is a seller and telemarketer that initiates, causes the initiation of, and assists the initiation of outbound telephone calls to induce consumers to purchase goods or services. Alliance, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

18.     *Gotra* is the founder, chief executive officer, and majority owner of Alliance. At all times material to this Complaint, acting alone or in concert with others, Gotra has had the authority and responsibility to prevent or correct unlawful telemarketing practices of Alliance, and has formulated, directed, controlled, or participated in the acts and practices of Alliance, including the acts and practices set forth in this Complaint. Gotra, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

19.    ***Defend America*** is a former Florida limited liability company that was dissolved on November 1, 2016. Defend America was a telemarketer that initiated outbound telephone calls to induce consumers to purchase goods or services from Alliance or Alliance's client, Monitronics. Defend America, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

20.    ***Jessica Merrick a/k/a Jessica Bright a/k/a Jessica Dudlicek ("Merrick")*** was a founder and owner of Defend America. At all times material to this Complaint, acting alone or in concert with others, Merrick had the authority and responsibility to prevent or correct unlawful telemarketing practices of Defend America, and formulated, directed, controlled, or participated in the acts and practices of Defend America, including the acts and practices set forth in this Complaint. Merrick, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

21.    ***Power Marketing*** is a former North Carolina limited liability company that was dissolved on September 14, 2017. Power Marketing was a telemarketer that initiated outbound telephone calls to induce consumers to purchase goods or services from Alliance or Alliance's client, Monitronics. Power Marketing, in connection with the matters alleged herein, transacted business in this district and throughout the United States.

22.    ***Kevin Klink*** is an owner, officer, and manager of Power Marketing. At all times material to this Complaint, acting alone or in concert with others, Klink had the authority and responsibility to prevent or correct unlawful telemarketing practices of Power Marketing, and formulated, directed, controlled, or participated in the acts and practices of Power Marketing, including the acts and practices set forth in this Complaint. Klink is a recidivist unlawful telemarketer who was sued in his individual capacity, along with his prior company ISI Alarms, in *Mississippi Public Service Commission v. ISI Alarms, Inc.,* Docket No. 2013-NC-32 (Miss. Pub. Serv. Comm'n 2013). Klink, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. Mr. Klink's former company, ISI Alarms, also consented to a judgment in a case where a consumer alleged that ISI

Alarms had unlawfully obtained her credit report or credit score, in violation of the FCRA. *See* Dkt. No. 64, *Grice v. ISI Alarms NC, Inc.,* No. 2:12-cv-02873 (E.D. La. Sept. 19, 2013).

## COMMERCE

23.     At all times relevant to this complaint, all of the Defendants have maintained a substantial course of trade or business in marketing goods or services via the telephone, in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE TELEMARKETING SALES RULE
## AND THE NATIONAL DO NOT CALL REGISTRY

24.     Congress directed the Commission to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The Commission adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

25.     Among other things, the 2003 amendments to the TSR established a do-not-call registry, maintained by the Commission (the "DNC Registry"), of consumers who do not wish to receive certain types of telemarketing calls. Consumers can register their telephone numbers on the DNC Registry without charge either through a toll-free telephone call or over the Internet at donotcall.gov.

26.     Consumers who receive telemarketing calls to their registered numbers can complain of DNC Registry violations the same way they registered, through a toll-free telephone call or over the Internet at donotcall.gov, or by otherwise contacting law enforcement authorities.

27.     The FTC allows sellers, telemarketers, and other permitted organizations to access the DNC Registry over the Internet at telemarketing.donotcall.gov, to pay the fee(s) if required, and to download the numbers not to call.

28.     Under the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff). A "seller" means any person who, in connection with a telemarketing transaction,

provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration. *Id*. § 301.2(dd).

29.     Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

30.     The TSR prohibits sellers and telemarketers from initiating or causing the initiation of an outbound telephone call to numbers on the DNC Registry. 16 C.F.R. § 310.4(b)(1)(iii)(B).

31.     The TSR prohibits telemarketers from initiating an outbound telephone call that fails to disclose the seller's identity truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call. 16 C.F.R. § 310.4(d).

32.     The TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, the seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person. 16 C.F.R. §310.3(a)(2)(vii).

33.     The TSR requires that sellers and telemarketers transmit or cause to be transmitted the telephone number of the telemarketer and, when made available by the telemarketer's carrier, the name of the telemarketer ("caller ID information"), to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on whose behalf the call is made and, when made available by the telemarketer's carrier, the name of the seller. 16 C.F.R. § 310.4(a)(8). Transmitting inaccurate caller ID information, or causing inaccurate caller ID information to be transmitted, is commonly called spoofing.

34.     It is a violation of the TSR for any person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c) or (d), or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

35.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE FAIR CREDIT REPORTING ACT

36.     The FCRA was enacted in 1970, became effective on April 25, 1971, and has been in force since that date. The Fair and Accurate Credit Transactions Act amended the FCRA in December 2003, and the Dodd-Frank Act amended the FCRA in July 2010.

37.     Section 621 of the FCRA, 15 U.S.C. § 1681s, authorizes the Commission to use all of its functions and powers under the FTC Act to enforce compliance with the FCRA by all persons subject thereto except to the extent that enforcement specifically is committed to some other governmental agency, irrespective of whether the person is engaged in commerce or meets any other jurisdictional tests set forth by the FTC Act.

38.     Section 603(d) of the FCRA, 15 U.S.C. § 1681a(d) defines a "consumer report" as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing a consumer's eligibility for (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purposes authorized under section 1681b of this title."

39.     Credit reports and credit scores are types of consumer reports.

40.     Section 604(f) of the FCRA, 15 U.S.C. § 1681b(f), prohibits persons from using or obtaining consumer reports in the absence of a "permissible purpose," as defined by Section 604(a) of the FCRA, 15 U.S.C. § 1681b(a).

41.     Pursuant to section 621(a)(1) of the FCRA, 15 U.S.C. § 1681s(a)(1), using or obtaining consumer reports without a permissible purpose constitutes an unfair or deceptive act or practice in violation of section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## ALLIANCE'S VIOLATIONS OF THE 2014 ORDER

42.     Section I.A. of the 2014 Order prohibits Alliance from initiating, causing the initiation of, or assisting the initiation of outbound telephone calls to any person at a number listed on the DNC Registry, unless Alliance proves that it had either: (a) express written consent from that person to place the call; or (b) a pre-existing business relationship with that person (the "DNC Prohibition of the 2014 Order"). Alliance has never complied with this aspect of the 2014 Order. Indeed, the day after this Court entered the 2014 Order, Alliance's own employees placed 622 outbound telephone calls to numbers listed on the DNC Registry. On the one-year anniversary of this Court entering the 2014 Order, Alliance's own employees placed 1,729 outbound telephone calls to numbers listed on the DNC Registry.

43.     In addition to violating the DNC Prohibition of the 2014 Order, Alliance has violated many other aspects of the Order, including the following:

a.  *Order Acknowledgments.* The 2014 Order required Alliance to obtain acknowledgments from all of its lead generators confirming that the lead generators had reviewed the 2014 Order and agree to comply with it within 90 days of entry of the order. Alliance failed to obtain any order acknowledgments until September 2015, after the Commission asked for proof of compliance.

b.  *Lead Generator Termination for Non-Compliance.* The 2014 Order required Alliance to "immediately cease" purchasing leads from any lead generator if the lead generator was telemarketing in a way that violated the 2014 Order. Alliance violated this requirement by continuing to purchase leads from lead generators that had sold Alliance leads violating the 2014 Order.

c.  *Failure to Disclose Alliance's Identity.* The 2014 Order prohibited Alliance from "engaging in, causing others to engage in, or assisting others engaging in …

[i]nitiating any Outbound Telephone Call in which Defendants or their Representatives fail to disclose truthfully, promptly, and in a clear and conspicuous manner the Defendants' identity." Alliance violated this aspect of the 2014 Order (and the TSR) by specifically prohibiting their lead generators and telemarketers from disclosing Alliance's identity or using Alliance's name in telemarketing calls unless consumers specifically ask for the name of the company that will be installing the home security system. In December 2015, Gotra testified under oath that Alliance's telemarketers and lead generators are "definitely not" allowed to identify Alliance in their telemarketing and lead generation calls. Alliance has even sent cease and desist letters to its own lead generators and telemarketers "to make them refrain from using our company name Alliance Security."

## DEFENDANTS' BUSINESS AND TELEMARKETING PRACTICES

### *-- Alliance's General Business Practices --*

44.     From April 24, 2014 through July 14, 2017, all of the home security systems Alliance installed were monitored by a single alarm monitoring company, Monitronics. During that same period, Alliance obtained almost all of its revenue from Monitronics. Alliance and Monitronics have been co-defendants in a series of ongoing consumer class action lawsuits that were consolidated by the panel on multi-district litigation "(MDL"). The MDL class action litigation alleged that Alliance and its telemarketers placed unlawful calls telemarketing calls on behalf of Monitronics. Monitronics has agreed to a proposed settlement of $28 million, but Alliance is not part of that settlement. *See in re Monitronics International Inc. Telephone Consumer Protection Act Litigation,* No. 1:13-MD-02493-JPB-JES (N.D. W. Va.).

45.     Alliance generally does not charge consumers for the home security system or for installing it. When Alliance's installers arrive at a consumer's house to install a home security system, they bring a contract for the consumer's purchase of monthly alarm monitoring services. Under that contract, the consumer agrees to pay a monthly fee, often for a period of several

years. Alliance's installers generally collect the first monthly payment when they install the home security system. This is a prepayment by the consumers in advance of activating the monitoring services. The contracts are generally electronic, not printed, and Alliance displays them to consumers on a tablet device.

46.     From April 24, 2014 through July 14, 2017, Alliance sold the signed alarm monitoring contracts to Monitronics, and Monitronics paid Alliance a percentage of the total value of the contract. Monitronics determined what percentage of the total contract value to pay Alliance partly based upon the consumer's credit score. For consumers with a high credit score, Alliance got a higher percentage of the total contract value. Monitronics generally did not pay Alliance if the consumer had a credit score below 600.

47.     Alliance generally will not send an installer to a consumer's home until it has obtained the consumer's credit score. Alliance's typical practice, however, is that it does not disclose to consumers that it obtains their credit information.

48.     Alliance identifies consumers who are interested in home security systems and alarm monitoring through telemarketing.

49.     Alliance has both an internal telemarketing program conducted by its own employees and an external telemarketing program conducted by third-party contractors that Alliance calls "dealers" or "independent business operators."

*-- Alliance's Consumer Credit Inquiries --*

50.     During Alliance's sales calls, which are initiated by Alliance or its telemarketers and not by consumers, Alliance often obtains information necessary to obtain the consumer's credit scores. Alliance often asks consumers for personal information during the sales calls, such as name, address, date of birth, or the last four digits of their social security number. Some of Alliance's sales scripts instruct the salespersons to use deceptive methods to obtain this information from consumers. For example, one script instructs the salespersons to tell consumers that they request this information to set up the customer's "secondary account number." Alliance's "rebuttal" sales script instructs salespersons to admit to consumers that Alliance

obtains consumers' credit scores or other credit information, but only if the consumer persists in asking questions. Despite this instruction in the rebuttal script, some of Alliance's sales managers have instructed its salespersons to tell consumers that Alliance does not obtain their credit information.

51.     Alliance has routinely obtained consumers' credit information from several consumer reporting agencies without disclosing these inquiries to the consumers, without obtaining consent, and without any other permissible purpose, as set forth in the FCRA.

52.     With its primary consumer reporting agency, Transunion, Alliance has made several certifications concerning its "permissible purpose" for obtaining consumer credit scores. In January 2017, Alliance's Chief Financial Officer, Douglas Anderson, certified to Transunion that Alliance's "sole" permissible purpose for obtaining consumer report information was "to use the Consumer Report Information in connection with transactions … initiated by a consumer." On April 11, 2017, Mr. Anderson certified to Transunion that Alliance's "sole" permissible purpose for obtaining consumer report information was "to use the Consumer Report Information in connection with … review[ing] an account to determine whether the consumer continues to meet the terms of the account."

53.     As a result of its credit inquiries to Transunion, Alliance has obtained consumers' credit information from Transunion after Alliance or its telemarketers initiated unsolicited telemarketing calls to the consumer—without the consumer's knowledge or consent, without the consumer having any existing or prior account with Alliance, and without any other permissible purpose under the FCRA.

54.     In addition to performing unlawful credit inquiries on its potential customers, Alliance has also obtained consumer credit scores or other consumer information of consumers who could not be potential customers, because they live in areas where Alliance did not install alarms.

55.     Alliance has also attempted to perform unlawful credit inquiries on many individuals who were not potential customers.

56.     For example, Alliance attempted to obtain from Transunion consumer credit scores, credit reports, or other consumer information after submitting the following consumer information to Transunion:

    a.  August 9, 2016—"Bill Clinton, *********, Washington, DC 20008."

    b.  October 18, 2016—"Joe Biden, 1600 Pennsylvania Ave, Washington, DC 20500." [1600 Pennsylvania Ave is the address of the White House.]

    c.  October 19, 2016—Barrack [sic] Obama, 1600 Pennsylvania Ave, Washington, DC 20500."

    d.  March 15, 2017—"Mike Pence, 3450 Massachusetts Ave NW, Washington, DC 20392." [3450 Massachusetts Ave is the address of the United States Naval Observatory, where the Vice Presidential residence is located.]

    e.  August 17, 2017—"Donald Trump, 1600 Pennsylvania Ave NW, Washington, DC 20006."

57.     The attempted unauthorized credit inquiry by Alliance seeking President Donald Trump's credit score on August 17, 2017 was *after* staff attorneys for the FTC informed Alliance that its investigation had expanded to include potential violations of the FCRA.

58.     Further, in some instances, Alliance actually obtained a credit score or credit report from Transunion when it submitted inquiries about public figures. For example, Transunion informed the FTC that on April 12, 2016 Alliance obtained a credit score or credit report from Transunion after Alliance submitted to Transunion an inquiry about the following consumer:  "James Comey, 1600 Pennsylvania Ave, Washington, DC 20001."

59.     In hundreds of thousands of instances, Alliance unlawfully obtained a credit score, credit report, or other consumer information from Transunion or another consumer reporting agencies without any permissible purpose under the FCRA.

*-- Alliance's Internal Telemarketing Program --*

60.     Alliance's employee telemarketers place outbound sales calls to consumers to attempt: to solicit the sale of home security systems and associated home security alarm

monitoring services; to arrange for the installation of the home security systems; and to provide consumers with their purchase price, a description of the equipment that will be installed, the length of the alarm monitoring contract, and other material terms of sale for the alarm monitoring contract. In some calls, Alliance also solicits the sale of additional home security products and services.

61.     Alliance places these calls to telephone numbers that are contained in "leads" that Alliance either purchases from its lead generators or obtains through customer referrals.

62.     From April 24, 2014 through July 31, 2015, Alliance's internal telemarketing program—including both the lead generator and customer referral programs—led to the initiation of 374,129 outbound telephone calls to numbers listed on the DNC Registry. Alliance's telemarketers placed these outbound telephone calls without express written consent from the consumers who owned those numbers, and without a pre-existing business relationship with those consumers.

63.     Alliance sent the FTC a letter informing the FTC that 120,000 of its outbound telemarketing calls to telephone numbers listed on the DNC Registry from April 24, 2015 through July 31, 2015 were made through Alliance's customer referral program.

64.     In its customer referral program, Alliance asks its existing customers to identify friends or family members who might be interested in obtaining a home security system. Alliance then calls those consumers referred by existing customers without scrubbing those numbers against the DNC Registry, without express written consent from those consumers, and without a pre-existing business relationship with those consumers.

65.     In response to an FTC inquiry about unwanted telemarketing calls by Alliance or its telemarketers Alliance sent a letter to the FTC falsely informing the FTC that it "has discontinued treating referrals as leads and no longer places telemarketing calls to such numbers."

66.     In truth, when Alliance sent that letter, it had not stopped treating referrals as leads and had continued placing telemarketing calls to such numbers.

67.     Alliance later sent another letter to the FTC, as part of its continued response to the FTC's inquiry about unwanted telemarketing calls, this time informing the FTC that: (a) it was still placing telemarketing calls to referral leads; and (b) it had continued calling referral leads without first scrubbing them to remove numbers listed on the DNC Registry.

68.     Since July 31, 2015, Alliance's own employees have continued placing outbound telephone calls to numbers on the DNC Registry. For example, a sample of Alliance's outbound telemarketing calls containing records of calls placed between September 1, 2015 and April 18, 2016, showed that Alliance placed 618,106 outbound telephone calls, 52,705 of which were to numbers on the DNC Registry (8.53% hit rate). Alliance's employees placed these post-July 2015 outbound telephone calls to numbers on the DNC Registry without express written consent from the consumers who owned those telephone numbers, and without a pre-existing business relationship with those consumers.

69.     Alliance provides all of its lead generators with access to Alliance's copy of the DNC Registry, access to Alliance's own internal do not call list, and access to another do not call list that Alliance calls its "no fly list." The "no fly list" is a list of telephone numbers belonging to consumers who either file lawsuits for telemarketing violations, threaten to file lawsuits, or complain frequently.

70.     Many of Alliance's lead generators place cold calls to consumers and play a prerecorded message asking the consumers if they are interested in a home security system. Consumers who indicate interest are told they will receive a call back shortly. The lead generators then transfer the consumers' telephone numbers to Alliance by logging into a web portal that Alliance created, hosts, and maintains.

71.     Alliance's web portal has settings that can "scrub" the leads against the National Do Not Call Registry so that it rejects leads that contain numbers listed on the National Do Not Call Registry. If a lead is rejected, Alliance's salespersons do not call that number.

72.     Alliance—and Gotra, personally—have told consumers that they never turn this scrubbing feature off.

73.     In truth, however, Alliance sometimes turns off the DNC scrub so that its system accepts leads containing telephone numbers listed on the DNC Registry. These numbers on the DNC Registry are then called by Alliance telemarketers.

74.     Sometimes, when Alliance receives complaints from consumers who are on the DNC Registry, Alliance falsely tells the consumers that they must periodically renew their numbers on the DNC Registry or their number will be removed from the Registry.

75.     In truth, however, telephone numbers remain on the DNC Registry indefinitely unless the number is disconnected or reassigned to a different person.

76.     One incident from November 10, 2015 provides an example of Alliance turning off the DNC scrub feature, receiving a consumer complaint as a result of turning off the DNC scrub feature, and then falsely telling the consumer that she was called because she failed to renew her number on the DNC Registry. After receiving a complaint from this consumer on November 10, 2015, an Alliance employee sent the following email (the "November 10, 2015 Email") to Alliance's DNC Administrator, who then forwarded it to Alliance's Director of Compliance:

> Attached is the recording of a phone call that was made to a phone number that is on the Federal DNC list at approx. 10:39am this morning.
>
> The lead for this phone number was submitted into our system by the office "HomeBiz"; which has the setting in Techspatch to opt-out of scrubbing the DNC lists when they submit their leads.
>
> I thought it would be smart to scrub all of their leads that they submitted today just to be safe, and found out that 58 out of 102 leads that were submitted by that dealer were just on Federal DNC lists.
>
> If you want me to go and remove those leads from the system or make any other changes in the system, let me know and I'll get to it ASAP.

77.     During the call with that consumer at 10:39 am on November 10, 2015, the consumer told the Alliance salesperson "I have my phone number on the National Do Not Call Registry." The consumer asked why Alliance called her when her number is listed on the DNC Registry. The Alliance salesperson responded: "I am not entirely sure how we got in touch with

17

you. Our system typically scrubs for numbers that are on that list. When was the last time that you renewed that? You have to go and check every so often and make sure that it's on there, 'cause it's not like a one-time deal that it will stay permanently blocked."

78.     The "office" called "HomeBiz" referenced in the November 10, 2015 Email was actually a lead generation campaign, conducted through telemarketing, by Justin Ramsey.

79.     From April 24, 2014 through April 29, 2016, Justin Ramsey ("Ramsey") was one of Alliance's largest lead generators, in terms of the number of leads Alliance purchased.

80.     Ramsey is also a recidivist robocaller who has been the subject of numerous law enforcement actions and private lawsuits concerning unlawful telemarketing calls. *See, e.g., FTC v. Ramsey, et al.,* No. 9:17-cv-80032-KAM (S.D. Fla.); *Indiana v. Ramsey, et al.,* No. 29D02-1309-MI-9135 (Hamilton Cty. Sup. Ct.).

81.     Prior to the November 10, 2015 Email about Ramsey's "HomeBiz" office, Alliance had received numerous complaints from consumers and Monitronics stemming from leads Alliance purchased from Justin Ramsey. Even after November 10, 2015, Alliance continued purchasing leads from Ramsey despite the 2014 Order's requirement that Alliance cease purchasing leads from non-compliant lead generators.

82.     In fact, instead of terminating its relationship with Ramsey, Alliance expanded the scope of its dealings with him. In March 2016, Alliance began accepting direct, inbound transfers of telemarketing calls from Ramsey. Alliance and Ramsey called one of these campaigns "Danger Zone." The Danger Zone campaign often worked in three steps: (1) Ramsey placed outbound telephone calls to consumers delivering prerecorded messages that asked them if they were interested in a home security system; (2) consumers who pressed 1 on their telephones or said yes to indicate interest were transferred to a call center where they were "pre-qualified;" and (3) consumers who were still interested and qualified were transferred directly to Alliance. Alliance had no capability to scrub the inbound calls against the DNC Registry.

83.     In March and April of 2016, Alliance received at least forty consumer complaints about the Danger Zone campaign.

84.     Consumers also complained to the FTC about calls made as part of the Danger Zone campaign, including a complaint about the use of a false Caller ID number ("Caller ID spoofing") that the FTC forwarded to Alliance on April 8, 2016. In that call, and many others, Ramsey used a specific type of Caller ID spoofing called "Neighbor Spoofing," in which the Caller ID number was made to appear as if the call was coming from a phone number similar to the consumer's phone number.

85.     On April 21, 2016, Ramsey sent an email to one of his business associates telling her that he was temporarily discontinuing much of his telemarketing because "I got way to [sic] much heat on my [sic] right now and so does alliance [sic]. Big heat I gotta let it blow over."

86.     On May 9, 2016, Alliance informed the FTC that, as a result of the Caller ID spoofing complaint forwarded by the FTC (and other factors), Alliance had terminated its business relationship with Ramsey, effective April 29, 2016.

87.     Also during the spring of 2016, Alliance made a change to its lead generator program and began using a single vendor, Avatar Technologies, Inc. a/k/a Avatar Outsourcing, Inc. a/k/a Compliant Dialer, Inc. ("Avatar"), for the majority of its lead generation. Alliance sent Avatar lists of consumer telephone numbers to call. Avatar then placed outbound telemarketing calls to the numbers on those lists using what is known in the telemarketing industry as "soundboard" or "avatar" technology.

88.     Avatar's soundboard technology and lead generation calls work as follows:

    a.   Avatar has call center agents in the Philippines;

    b.   Avatar uses its automated dialing program to place outbound telephone calls to consumers;

    c.   if a consumer answers the phone, the consumer is then connected with one of Avatar's agents; and

    d.   Avatar's agents then use Avatar's software to play prerecorded messages to consumers.

89.     The prerecorded messages Avatar's agents played to consumers generally asked consumers if they were interested in a home security system, if they had an existing home security system, and if they were homeowners. Alliance referred to this part of the call as "prequalifying" or "opening." Consumers who answered all three questions properly were deemed "prequalified" and then either transferred directly to Alliance or told they would receive a call back shortly. Alliance referred to the telemarketers who handled the transferred call or the call-backs as "closers."

90.     In Alliance's terms of service with Avatar, Alliance agreed that it was solely responsible for ensuring compliance with the TSR and the DNC Registry. Alliance also agreed that before sending Avatar any lists of telephone numbers, it would "scrub" those lists against the DNC Registry.

91.     From April 26, 2016 through June 4, 2016, Alliance's prequalification calls placed by Avatar—using the data lists supplied by Alliance—generated at least 91,909 calls to numbers listed on the DNC Registry. Neither Alliance nor Avatar had express written consent from the consumers who owned those telephone numbers. Nor did Alliance or Avatar have a pre-existing relationship with those consumers. Alliance initiated or caused the initiation of these 91,991 calls by providing Avatar with the specific telephone numbers to call and instructing them to place the calls. During the same timeframe—April 26, 2016 through June 4, 2016— Alliance did not download the DNC Registry.

*-- Alliance's Misleading Statements About Its Affiliation with ADT --*

92.     In addition to initiating or causing the initiation of calls to numbers listed on the DNC Registry, Alliance's salespersons also made misleading or false statements to consumers during telemarketing calls. For example, on or about February 19, 2016, a consumer on the phone with an Alliance Security telemarketer asked "this is ADT right?" The Alliance salesperson responded "uh, yeah, ADT actually just got bought out, I've actually been receiving a lot of these calls." The Alliance salesperson then put the consumer on hold. When he returned to the call, he told the consumer: "what I can actually do for you, because we actually just

recently got bought out, I'm not sure if you saw the news, so we can actually upgrade you to a newer system." These statements misrepresent, in the sale of goods or services, Alliance's affiliation with ADT. These statements also falsely represent that ADT was bought by Alliance in connection with the offering for sale or sale of goods or services.

93. Prior to Alliance's February 19, 2016 misleading statements and misrepresentations about ADT, Alliance had been accused of the same conduct by ADT. In July 2015, ADT sued Alliance and alleged that Alliance employees falsely told existing ADT customers that Alliance bought ADT. Alliance later paid ADT $1.5 million to settle the lawsuit. *See ADT v. Capital Connect Inc.,* No. 3:15-cv-02252-B (N.D. Tex.).

### *-- Alliance's Failures to Follow its Own Do Not Call Policy --*

94. At all times since at least 2012, Alliance has had an internal do not call policy. In numerous instances since April 24, 2014, Alliance has failed to follow that policy.

95. Alliance's do not call policy requires the company to access and download the latest version of the Registry every two weeks. Several times since April 24, 2014, Alliance has failed to download the Registry even once a month. For example, Alliance did not download the registry between April 26, 2016 and June 16, 2016. Then, after downloading the Registry on June 16, 2016, Alliance did not download the Registry again until September 12, 2016.

96. Since at least 2012, Alliance's do not call policy has stated that consumers on do not call lists may not be called and that "there are no exceptions including the customer being a referral." Nevertheless, Alliance later informed the FTC that it placed at least 120,000 calls to numbers listed on the Registry through its customer referral program.

### *-- Alliance's External "Dealer" Telemarketing Program --*

97. In addition to placing its own outbound telemarketing sales calls, Alliance also contracts with third party telemarketers it calls "dealers" or "independent business operators."

98. Alliance has informed the FTC that it has written contracts with all of its "dealers."

99.     The written contracts between Alliance and its dealers characterize their business arrangement as one in which the dealer enters into an alarm monitoring contract with consumers and then later sells those contracts to Alliance. However, this does not reflect their actual business practices. In reality, the dealers initiate outbound telemarketing calls to consumers to: solicit the sale of Alliance home security systems and associated home security alarm monitoring services; arrange for the installation of the home security systems; and provide the consumers with a purchase price, a description of the equipment that will be installed, the length of the alarm monitoring contract, and other material terms of sale for the alarm monitoring contracts. The dealers then provide Alliance with the consumers' contact information, scheduled date and time of installation, and certain details about the type of home security system the consumers want. Although the dealers arrange for installation and provide the consumers with a purchase price and other terms of sale, the dealers never accept payment from the consumers or provide Alliance with a written contract.

100.    After a dealer sets an appointment for Alliance's installers to visit a consumer's home, Alliance generally calls the consumer to confirm the appointment. After confirming the appointment, Alliance sends its installers to the consumer's home with Alliance home security system equipment and an alarm monitoring contract.

101.    Alliance's dealers set the appointment for installation—and determine the availability of Alliance's installers—by logging into a web portal hosted by Alliance. Through that web portal, Alliance provides all of these third-party telemarketers with access to Alliance's calendar, so that the telemarketers can schedule appointments for Alliance to install home security systems.

102.    Through the same web portal, Alliance also shares with these telemarketers a copy of its internal do not call list and Alliance's copy of the DNC Registry.

103.    Alliance sends these dealers bi-weekly emails reminding them to download the DNC Registry from Alliance's web portal.

22

104.    Alliance prohibits these dealers from using Alliance's name (or Monitronics's name) in their telemarketing, unless a consumer specifically asks the name of the company that will be installing the alarm or the name of the company that will be monitoring the alarm.

105.    Although Alliance provides these telemarketers with access to its internal calendar, access to its internal do not call list, and access to Alliance's copy of the DNC Registry, Alliance does no due diligence to ensure that its dealers have downloaded these lists. Nor does Alliance do sufficient due diligence to check whether its dealers comply with the TSR or other telemarketing laws. Alliance does not even ask its dealers to identify the person responsible for ensuring compliance with the TSR.

106.    In fact, Alliance does not do any due diligence to ensure that the written contracts with its "dealers" contain truthful and accurate information about the telemarketers' names, identities, and contact information. For example, on January 8, 2015, Alliance entered into an "Independent Business Operator Agreement" with a company that identified itself in the contract as "sdf." That contract shows that it was signed by "jhjkh." The dealer listed its address as "jh, jkh, ri 02888." Alliance accepted many similar contracts from its dealers.

107.    In another example—just two weeks after this Court entered the 2014 Order—Alliance entered into a contract with M & J Security. The contract was signed by "John Smith" who listed the company's address as "1 first street, n.k., RI 02852." However, the contract was actually submitted by Justin Ramsey, one of Alliance's largest lead generators.

*-- Defend America's Exclusive Telemarketing for Alliance --*

108.    Defend America was a telemarketing company that had a contract with Alliance to serve as an Alliance "dealer" or "independent business operator."

109.    Defend America was one of Alliance's largest dealers. From April 24, 2014 through December 5, 2015, Alliance paid Defend America more than $2.8 million.

110.    On or about March 10, 2015, Defend America entered into an exclusive agreement with Alliance under which Defend America agreed that it would "NOT sell and/or market products or services, which are similar to that Alliance offers and SHALL NOT sell for

any other individual or entity." Defend America's owner, Defendant Jessica Merrick, signed that exclusivity agreement for Defend America using her prior name, Jessica Dudlicek. The agreement stated that it would be effective for three years.

111.    While Defend America was telemarketing for Alliance under the exclusive agreement, Alliance received numerous complaints about Defend America and other information indicating that Defendant America was not complying with telemarketing laws. For example:

   a.   On December 4, 2015, Alliance received a complaint from Monitronics. The complaint stated that Defend America repeatedly placed unwanted calls to a consumer's telephone number that was listed on the DNC Registry and that Defend America had informed the consumer it was affiliated with Alliance Security. Monitronics specifically told Alliance to "contact Defend America to ensure that they cease calls to this consumer immediately."

   b.   On February 9, 2016, Alliance received a complaint from a consumer in Georgia who threatened to sue Alliance for unwanted sales calls. On March 1, 2016, the same consumer called Alliance's DNC Administrator and let her know that he was still receiving unwanted home security telemarketing calls. On March 2, 2016, the same consumer agreed to set an appointment for an Alliance installer to come to his house. He did so in a desperate attempt to get the calls to stop. After setting the appointment, he called Alliance's DNC administrator and told her that he had set the appointment. Also on March 2, 2016, Alliance's DNC administrator made a note in her file that "I saw in the work order that the lead provider was Defend America. I called Jessica and told her to remove him off their call list ASAP."

   c.   On March 1, 2016, Alliance received an email from Monitronics about a consumer in North Carolina who was complaining about unwanted sales calls from Alliance, despite being on the DNC Registry. Alliance's DNC

Administrator responded to Monitronics and said "I do see a work order set up and Defend America was the dealer."

112.     Despite these—and numerous other—complaints about unlawful calls that Defend America made while telemarketing for Alliance, Alliance continued its relationship with Defend America.

113.     From March 1, 2016 through June 30, 2016, while Defend America was still operating under its exclusive agreement with Alliance, Defend America used Avatar to place outbound calls to consumers. During this time period, Merrick sent Avatar the lists of consumer telephone numbers to dial, determined the number of pre-qualifiers or openers that Avatar would use for Defend America's campaigns, paid the invoices sent by Avatar, and approved all of the scripts for the prerecorded messages played by Avatar's agents.

114.     In its terms of service with Avatar, Defend America agreed that it was solely responsible for ensuring compliance with the TSR and the DNC Registry. Defend America also agreed that, before sending Avatar any lists of telephone numbers, it would "scrub" those lists against the DNC Registry.

115.     None of the prerecorded messages played by Avatar in its Defend America campaigns disclosed the identity of Avatar, Defend America, Alliance, or Monitronics.

116.     Using the data lists provided by Merrick, and playing the prerecorded message approved by Merrick, Avatar placed 492,089 outbound calls for Defend America between March 1, 2016 and June 30, 2016.

117.     All 492,089 of these outbound telephone calls failed to promptly, truthfully, and clearly and conspicuously identify Alliance, Defend America, Avatar, or Monitronics, and therefore failed to identify the seller or telemarketer.

118.     All 492,089 of these outbound telephone calls failed to promptly, truthfully, and clearly and conspicuously identify Alliance as required by the 2014 Order.

119.     Of these 492,089 outbound telephone calls, 403,599 (82%) were to numbers listed on the DNC Registry.

25

120.    Alliance caused the initiation of Defend America's 492,089 outbound telephone calls from March 1, 2016 through June 30, 2016—including 403,599 to numbers listed on the DNC Registry.

121.    On September 6, 2016, Alliance sent Merrick a letter terminating its relationship with Defend America. In the termination letter, Alliance stated "Alliance has received consumer complaints from multiple sources regarding your marketing … Specifically, Alliance has verified recent reports alleging that you have contacted individuals on the Federal Do-Not-Call list without consent."

*-- Power Marketing Promotions' Telemarketing for Alliance --*

122.    Power Marketing was formed in December 2014 as part of the transaction in which Alliance purchased its largest competitor. Klink was one of the owners or managers of that competitor. As part of the structure of the purchase, Klink resigned his position from the competitor, formed Power Marketing, and signed a contract for Power Marketing to serve as an Alliance dealer. Klink's resignation from the competitor and the contract he signed for Power Marketing to become an Alliance dealer were both exhibits to Alliance's contract purchasing the competitor. Also as part of that purchase, Alliance obtained documents providing it with notice of state law enforcement actions and private lawsuits against Klink's former company.

123.    Also in December 2014, Gotra told Klink that Power Marketing should buy its data lists (of consumer telephone numbers) from Ramsey. Gotra told Klink that Alliance would pay Ramsey directly for supplying Power Marketing with these data lists. This arrangement continued at least until April 2016, when Alliance terminated its business relationship with Ramsey. At that point, Power Marketing continued obtaining data lists from Ramsey but paid Ramsey directly using Power Marketing funds.

124.    At all times between April 27, 2016 and June 27, 2016, Power Marketing transacted business with Alliance pursuant to a written contract with Alliance (the "Power Marketing Contract").

125.    The Power Marketing Contract anticipated that Power Marketing would engage in telemarketing to set appointments for Alliance to install home security systems.

126.    When Alliance entered into the Power Marketing Contract, which Klink signed for Power Marketing, Alliance was aware that Klink had previously owned, managed, or been an officer of other companies that were sued by: (a) the State of Indiana for making calls to telephone numbers listed on the Indiana do not call list; and (b) the State of Mississippi for violating the Mississippi Telephone Solicitation Act.

127.    As part of their business relationship under the Power Marketing Contract, and at all times between April 27, 2016 and June 27, 2016, Alliance provided Power Marketing with access to a copy of Alliance's internal do not call list and Alliance's copy of the DNC Registry.

128.    Between April 27, 2016 and June 27, 2016, Power Marketing conducted a telemarketing campaign under its DBA name, J Tele Alarms. The J Tele Alarms campaign placed outbound telemarketing calls to consumers to attempt to set appointments for the installation of alarms by Alliance. As part of this campaign, Power Marketing d/b/a J Tele Alarms used Avatar to place the calls and "pre-qualify" consumers who might be interested in obtaining a home security system.

129.    Klink determined the number of "pre-qualifiers" that Avatar would dedicate to the J Tele Alarms campaign, and he paid the J Tele Alarms invoices from Avatar using Power Marketing's accounts and funds. Klink also agreed to Power Marketing's terms of service with Avatar, which required Power Marketing to "scrub" its dialing lists against the DNC Registry.

130.    The dialing lists used in the J Tele Alarms campaign were provided by Ramsey, who sent them to Klink's business associate in Pakistan. Klink's Pakistani business associate then sent the dialing lists to Avatar.

131.    Between April 27, 2016 and June 27, 2016, Avatar placed at least 684,789 outbound telephone calls as part of the J Tele Alarms campaign.

132.    All 684,789 of these outbound telephone calls failed to promptly, accurately, and clearly and conspicuously identify Alliance, Power Marketing, Avatar, or Monitronics, and therefore failed to identify the seller or telemarketer.

133.    All 684,789 of these outbound telephone calls failed to promptly, accurately, and clearly and conspicuously identify Alliance as required by the 2014 Order.

134.    Of these 684,789 outbound telephone calls, 125,009 (18.26%) were placed to numbers listed on the DNC Registry. Neither Power Marketing nor Alliance had express written consent from the consumers who owned those numbers or a pre-existing business relationship with those consumers.

135.    Alliance caused the initiation of Power Marketing's 684,789 outbound telephone calls from March 1, 2016 through June 30, 2016—including the 125,009 that were placed to numbers on the DNC Registry.

136.    Between April 27, 2016 and June 27, 2016, the outbound telephone calls in the J Tele Alarms campaign displayed (314) 526-2011 as the Caller ID number.

137.    Between April 27, 2016 and June 27, 2016, the FTC received over 300 complaints from consumers about unwanted calls displaying (314) 526-2011 as the Caller ID number. The content of many of these consumer complaints referenced home security products and/or specifically referenced Alliance.

138.    In addition, several consumers who received calls as part of Power Marketing's J Tele Alarms campaign complained about those calls directly to Alliance.

139.    During this time frame, Alliance received many complaints about Power Marketing and Klink's telemarketing. For example, on June 14, 2016, Alliance's Legal Administrator sent an email to Alliance's Director of Compliance telling him:

> I got another complaint about Kevin Klink and Haider. Called 815-[xxx]-8314, this number is on the Federal and internal DNC and has been.

> [Another Alliance employee] helped me contact the number 570-867-8743 which is the number that showed up on this consumers [sic] caller ID and he followed through and confirmed this was klink [sic] and Haider. They said they were Alliance, ADT, Family Protection Technologies among other names.

140.    The statements—and others like them—made by Klink's telemarketers that "they were … ADT" are misrepresentations about a telemarketer's affiliations.

141.    Also on June 14, 2016, an Alliance employee emailed Klink (with Gotra copied on the email) to inform Klink that he and Power Marketing were placing calls to consumers with telephone numbers listed on the DNC Registry who had previously asked to be removed from Power Marketing's call lists. Instead of terminating its relationship with Klink and Power Marketing, Alliance informed Klink that:

> Below there is a list of name and phone numbers that you called and submitted to us that we got complaints about or appear on the federal or our internal no fly. I know you scrub your leads through the internal no-fly but you need to make sure that you are scrubbing the federal DNC list as well … your office is calling customers multiple times a day when the customer have asked to be put on the DNC list and customer only scheduling an appointment with us to waste our time to tell us to stop calling them.

142.    The same day, on June 14, 2016, an Alliance employee sent another email to Klink with a subject line: "More DNC Phone Numbers."

143.    On June 14, 2016, Power Marketing's J Tele Alarms campaign placed outbound telephone calls to 7,538 numbers listed on the DNC Registry. The following day, June 15, 2016, Power Marketing's J Tele Alarms campaign placed outbound telephone calls to 2,483 numbers listed on the DNC Registry.

144.    In the June 14, 2016 email from Alliance to Klink with the subject line "More DNC Phone Numbers," Alliance included the phone number of a consumer from Howard County, Maryland with a telephone number (410) xxx-xxxx. On June 7, 2016, the J Tele Alarms campaign called this consumer. He had received so many unwanted sales calls pitching home security systems that when he received this call—the fourth alarm sales call of the day—he finally agreed to set an appointment for installation, just so he could learn the identity of the

company responsible for the calls and tell the company, face-to-face, to stop calling him. The consumer made this decision because all of his prior requests to remove his number from the call lists had been ignored, and because when he asked the name of company calling him, the calls were disconnected. When the installer arrived at this consumer's home, the consumer told the Alliance installer that he had no interest in a home security system and just wanted them to stop calling him. Unbeknownst to this consumer—and without his permission or any other permissible purpose—before sending an installation technician to his home, Alliance obtained his credit score from a consumer reporting agency. This person was one of the many consumers who had scheduled an appointment just to tell Alliance to stop calling.

145.    After June 14, 2016, Alliance continued its business relationship with Klink and Power Marketing, continued permitting them to conduct telemarketing to set appointments for Alliance to install home security systems, and continued providing Klink and Power Marketing access to Alliance's copy of the DNC Registry.

146.    On June 20, 2016,  an Alliance employee sent another email to Klink telling him: "When they keep calling the customer, of course they are going to set up an appointment to have someone come out to their home to tell them to stop calling. This isn't the first time we received a complaint about this situation."

147.    Also on June 20, 2016, Klink emailed Alliance and said "[w]e go by whatever you provide for us to scrub since we're calling on your behalf."

## VIOLATIONS OF THE FCRA

### Count I: Obtaining Consumer Reports Without a Permissible Purpose
(Alliance and Gotra)

148.    Section 604(f) of the FCRA, 15 U.S.C. § 1681b(f), prohibits persons from using or obtaining consumer reports without a "permissible purpose" identified in the statute.

149.    As described in Paragraphs 9, 46-47, 50-59, and 144, and in multiple other instances, Defendants Alliance and Gotra knowingly obtained consumer reports without a permissible purpose.

150.    By and through the acts and practices described in Paragraphs 9, 46-47, 50-59, 144 and 149 above, and in multiple other instances, Defendants Alliance and Gotra have violated section 604(f) of the FCRA, 15 U.S.C. § 1681b(f).

151.    The violations of the FCRA, as alleged above in paragraphs 9, 46-47, 50-59, 144, and 148-150, constitute violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## <u>VIOLATIONS OF THE TELEMARKETING SALES RULE</u>

### Count II: Calls to Persons Registered on the National Do Not Call Registry
(All Defendants)

152.    In numerous instances, in connection with telemarketing, Defendants initiated or caused others to initiate an outbound telephone call to a person's telephone number on the National Do Not Call Registry in violation of the TSR. 16 C.F.R. § 310.4(b)(1)(iii)(B).

### Count III: Calls to Induce the Purchase of Goods or Services that Fail to Identify the Seller
(Defend America, Merrick, Power Marketing, and Klink)

153.    In numerous instances, in connection with telemarketing, Defendants Defend America LLC, Merrick, Power Marketing LLC, and Klink have initiated or caused others to initiate an outbound telephone call that failed to disclose the seller's identity truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call. 16 C.F.R. § 310.4(d).

### Count IV: Misrepresentations Concerning a Seller or Telemarketer's Affiliations
(Alliance, Gotra, Power Marketing, and Klink)

154.    In numerous instances, in connection with telemarketing, Defendants Alliance, Gotra, Power Marketing LLC, and Klink made misrepresentations about their affiliations with other persons, including without limitation ADT.

155.    Defendants misrepresentations about their affiliations with other persons, as alleged, constitute violations of 16 C.F.R. § 310.3(a)(2)(vii).

**Count V: Assisting and Facilitating Abusive or Deceptive Telemarketing Acts or Practices**
(Alliance and Gotra)

156.    In numerous instances, in connection with telemarketing, Defendants Alliance and Jasjit Gotra have provided substantial assistance or support to sellers or telemarketers whom it knew or consciously avoided knowing were engaged in the following violations of the TSR:

    a.   causing others to engage in initiating or causing the initiation of an outbound telephone call to a person's telephone number on the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B);

    b.   causing others to engage in initiating or causing the initiation of an outbound telephone call that failed to disclose the seller's identity truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, in violation of the TSR, 16 C.F.R. § 310.4(d);

    c.   making misrepresentations about their affiliations with other persons. 16 C.F.R, § 310.3(a)(2)(vii); and

    d.   failing to transmit or cause to be transmitted to any Caller Identification Service in use by a recipient of a Telemarketing call either: (i) the telephone number and name of the Telemarketer making the call; or (ii) Defendants' name and customer service telephone number, 16 C.F.R. § 310.4(a)(8).

157.    Alliance's substantial assistance or support as alleged in Paragraph 156 above violates the TSR, 16 C.F.R. §310.3(b).

## VIOLATIONS OF THE FTC ACT

158.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

159.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act. 15 U.S.C. § 45(a).

**Count VI: Misrepresentations in Violation of the FTC Act**
(Alliance, Gotra, Power Marketing, and Klink)

160.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of home security systems and monthly alarm monitoring services, Defendants Alliance, Gotra, Power Marketing, and Klink have represented, directly or indirectly, expressly or by implication, that:

      a.     Defendants were affiliated or associated with ADT or another competitor alarm installation or monitoring company; or

      b.     Defendants were a successor company to ADT or another Alliance competitor.

161.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 160 of this Complaint:

      a.     Defendants were not affiliated or associated with ADT or another competitor alarm installation or monitoring company; or

      b.     Defendants were not a successor company to ADT or another Alliance competitor.

162.     Therefore, Defendants' representations, as set forth in Paragraph 160 of the Complaint, are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

163.     Consumers in the United States have suffered and will continue to suffer injury as a result of Defendants' violations of the FTC Act, the TSR, and the FCRA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

164.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other ancillary relief to halt and redress any violation of any provision of law enforced by the FTC, including the TSR. Section 621(a) of the FCRA, 15 U.S.C. § 1681s(a), also authorizes this Court to issue a permanent injunction to prevent continued violations of the FCRA. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

165.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended, and as implemented by 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties. From 2014 until July 31, 2016, the Court was authorized to award a penalty of up to $16,000 for each violation of the TSR. *See* 16 C.F.R. § 1.98(d) (2009). Effective August 1, 2016, the maximum penalty amount was adjusted to $40,000 per violation, pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74 § 701 (further amending the Federal Civil Penalties Inflation Adjustment Act of 1990), and Federal Trade Commission Rule 1.98, 16 C.F.R. § 1.98, 81 Fed. Reg. 42,476 (June 30, 2016).

166.    Defendants' violations of the TSR were committed with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

167.    Section 621(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s(a)(2)(A), authorizes the Court to award monetary civil penalties in the event of a knowing violation of the FCRA, which constitutes a pattern or practice of violations. Defendants' violations of the FCRA, as alleged in this Complaint, have been knowing and have constituted a pattern or practice of violations. As specified by the Federal Civil Penalty Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvements Act of 1996, Pub. L. 104-134, § 31001(s)(1), 110 Stat. 1321-373, the Court is authorized to award a penalty of not more than $3,500 per violation

for violations occurring before August 1, 2016, $3,756 per violation for violations occurring between that date and January 23, 2017, and $3,817 for violations occurring on or after January 24, 2017.

168.    Each instance in which Defendants failed to comply with the FCRA constitutes a separate violation of the FCRA for the purpose of assessing monetary civil penalties under section 621 of the FCRA, 15 U.S.C. § 1681s. Plaintiff seeks monetary civil penalties for every separate violation of the FCRA.

169.    This Court, in the exercise of its equitable jurisdiction, may award ancillary relief to remedy injury caused by Defendants' violations of the FTC Act, TSR, and FCRA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court, pursuant to 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 1681s, and pursuant to the Court's own equitable powers:

A.    Enter judgment against Defendants and in favor of Plaintiff for each law violation alleged in this Complaint;

B.    Award Plaintiff monetary civil penalties from Defendants for each violation of the TSR and FCRA, as alleged herein;

C.    Enter a permanent injunction to prevent future violations of the FTC Act, TSR, and FCRA by Defendants, as alleged herein; and

D.    Award Plaintiff the costs of bringing this action, as well as such additional relief as the Court may determine to be just and proper.

Respectfully submitted,

David Shonka
Acting General Counsel

Dated: March 22, 2018

Ian Barlow
Danielle Estrada
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
(202) 326-3120 (Barlow)
(202) 326-2630 (Estrada)
(202) 326-3395 (facsimile)
ibarlow@ftc.gov
destrada@ftc.gov

*Attorneys for Plaintiff*
FEDERAL TRADE COMMISSION